Austin Congress Corporation, an Illinois Corporation, Plaintiff-Appellee, v. Anthony Mannina, et al., Defendants-Appellants.

Gen. No. 49,391.

First District, Second Division.

January 14, 1964.

Kirkland, Ellis, Hodson, Chaffetz & Masters, and William T. Kirby, all of Chicago (Thomas M. Thomas and Frederick W. Temple, of counsel), for appellants.

David, Fainman, Abrahams & Chapman, and Devoe, Shadur, Mikva & Plotkin, all of Chicago (Dan R. Roin, Milton I. Shadur, Robert Plotkin and William Shlensky, of counsel), for appellee.

MR. JUSTICE BRYANT delivered the opinion of the court.

This is an interlocutory appeal from an order of the Circuit Court of Cook County entered on November 4, 1963, decreeing a writ of temporary injunction restraining defendant Anthony Mannina, and others, from (1) picketing at or near the nursing home located at 901 South Austin Boulevard; (2) publicly stating in any manner that plaintiff's nursing home and/or the construction thereof are in violation of any building code and/or that safety is impaired therein; (3) engaging in any other conduct for the purpose of coercing or inducing persons who might otherwise lawfully transact business with plaintiff by becoming patients in said nursing home not to do so; (4) doing any other thing to in any manner injure or interfere with plaintiff, its property or business; (5) combining or conspiring for the purpose or with the effect of doing anything prohibited above; (6) engaging in any other conduct for the purpose of coercing or inducing persons who might otherwise lawfully transact business with plaintiff by becoming patients in said nursing home not to do so, or with the ultimate objective of coercing and forcing plaintiff to abide by defendants' interpretation of the Chicago Building Code rather than the interpretation which has been made by the Building Commissioner of the City of Chicago and applied over a period of many years.

The appellants after acquiescing to the breadth of the injunction in the lower court and again in oral argument before us nevertheless maintain that the injunction is unnecessarily broad. It is true that the appellants have engaged only in picketing and that courts generally are more reticent to enjoin forms of more protected communication. Since this objection was never presented to the chancellor nor preserved in the record we shall disregard the breadth of the

injunction and confine our remarks solely to the question of picketing.

Plaintiff, Austin Congress Corporation, secured a building permit on or about July 27, 1962, for the construction of a six story nursing home and received approval of plans calling for pyrobar and plaster partitions. On or about June 26, 1963, inspectors from the Department of Buildings determined that the partitions had been constructed of ⅝ inch sheet rock material affixed to steel studs. Because of this variation from the approved plans, construction was ordered stopped by the Department of Buildings. On June 27, 1963, revised plans were submitted for approval and approved immediately as being in accordance with the provisions of the Chicago Building Code. Specifically, the commissioner of buildings in a letter dated August 21, 1963, found that although the work was not being done in accordance with originally approved plans; the assembly used for interior partitions had been erected in accordance with ASTM Fire Endurance and Hose Stream Test; and this test indicates that the assembly of materials being used has a one hour fire rating in accordance with building code requirements; and this material was installed in accordance with the revised approved plans.

On June 26, 1963, the defendants began picketing the almost completed nursing home carrying placards which read, "Building Code Violated—Safety Impaired" and "Walls and Partitions in This Building are Combustible." The defendants continued their picketing throughout the summer and until the day of the injunction order. The plaintiff made no attempts to restrain the picketing until September 15, 1963, when the complaint was filed. The plaintiff felt that it would be impossible to fill its building now that it had been completed while pickets paraded before the building. It is no secret that the picketing has been

194

fostered and supported by the "plastering" interests and that this incident is but one in a long standing controversy between proponents of "dry wall" and proponents of "real plaster" walls.

The defendants-appellants maintain that the building was constructed of combustible material (material which will ignite when heated to a temperature at or below 1200° Fahrenheit; Chicago, Ill., Municipal Code § 65–2(a), 1957) and, therefore, is in violation of the Building Code. Section 53.3(a) requires:

> "Partitions enclosing corridors required as a means of exit and partitions enclosing bedrooms or bed wards shall be of noncombustible construction providing fire resistance of not less than one hour. . . ." (Chicago, Ill., Municipal Code § 53–3(a), 1949.)

They contend that there is an absolute right to picket providing that such picketing is peaceful, truthful and informational. They point out that the plaintiff-appellee has admitted for the purposes of this appeal that the material is combustible, and, therefore, a violation of the building code.

The plaintiff in its answer denies that "dry wall" is combustible and has offered and will be required to prove that "dry wall" does not burst into flames at or before 1200° Fahrenheit. For the purposes of this appeal, however, plaintiff has taken the position that the combustibility of the "dry wall" is irrelevant since the injunctive relief was granted solely on the merits of plaintiff's first four counts. (Although on appeal this concedes the issue of combustibility, it does not concede the question of building code violation.)

The record clearly shows that the court adopted the position of the plaintiff and granted the temporary injunction on the merits of plaintiff's counts one through four. The theory of count one is that if de-

fendants continue the picketing complained of or commit other unlawful acts for the same purpose, plaintiff's property, business, reputation and goodwill will be substantially damaged and numerous persons who would otherwise transact lawful business with plaintiff by becoming patients in said nursing home will not do so, as a direct consequence of which plaintiff will suffer substantial monetary damage and that with continued picketing those damages will be unascertainable and irreparable. Count two alleges that the conduct complained of is malicious and intended by defendants to coerce or induce persons who might otherwise transact lawful business by becoming patients in the nursing home not to do so and that such conduct is the intended result of an unlawful combination and conspiracy. Count three sets up the approval by the building commissioner of the revised construction plans and alleges that such plans have consistently over a period of years been approved as being in accordance with all of the provisions of the Chicago Building Code and that the purpose of the picketing is to coerce and force plaintiff to abide by defendants' interpretation of the Chicago Building Code. Count four alleges that the conduct complained of in Count three is the intended result of an unlawful combination and conspiracy to persuade persons from becoming patients in plaintiff's home and to force compliance with defendants' interpretation of the building code.

Regardless of the merits of granting injunctive relief, the appellants maintain that the writ was prematurely granted and that a simple oven test of the combustibility of "dry wall" would settle the matter.

The primary purpose of a temporary injunction is to preserve the matters in status quo until the court has had an opportunity to decide the case upon its merits. Hoagland v. Bibb, 12 Ill App2d 298, 304, 139

NE2d 417; Bowman Shoe Co. v. Bowman, 21 Ill App2d 423, 440, 158 NE2d 112; 3 Nichols Illinois Civil Practice, ch 38, § 2267. The merits of a controversy are usually not brought before the reviewing court by an interlocutory appeal, Shatz v. Paul, 7 Ill App2d 223, 234, 129 NE2d 348; Hebenstreit v. Consolidated Coal Co., 3 Ill App2d 453, 459, 122 NE2d 843; Scholz v. Barbee, 344 Ill App 630, 638–639, 101 NE2d 845; Nestor Johnson Mfg. Co. v. Goldblatt, 371 Ill 570, 574, 21 NE2d 723.

This controversy is not as easily disposed of as appellants would lead us to believe. Presuming that a factual determination of the combustibility of "dry wall" could be demonstrated in open court, there still remains the question of what is a "partition." The building code permits the use of combustible paint, wallpaper and other material for surface decoration and interior trim when affixed to a non-combustible base. Is sheet rock any different from plaster covered with wallpaper?

A determination that there has been a building code violation and that the building commissioner exceeded his authority in permitting a deviation from the originally approved plans must necessarily be entwined with the combustibility question. These are complex questions of law and fact going to the merits of the case and without adequate briefing here. The chancellor properly deferred consideration until hearing on the permanent injunction. We need only determine whether the chancellor properly allowed an injunction based on the first four counts of the complaint. From the face of the complaint irreparable damage is alleged and apparent.

Appellants have invited our attention to four cases in opposition to the issuance of the temporary injunction. In the case of Huerbinger Drug Co. of Glenview v. Topp's of Niles, 28 Ill App2d 336, 339, 170 NE2d

653, this court in reversing a temporary injunction order emphasized that there was no showing of an emergency because the course of the case with respect to the pleadings and the hearing had been unhurried; it was probable that the status quo was being upset rather than maintained; and, there was an apparent inconsistency in the restraint since there was a finding of irreparable damage, but the defendant was permitted to indulge the alleged unlawful conduct for several weeks. There is no evidence here of an unhurried approach by the plaintiffs in the lower court. The hearing dates were determined to conform to the work load of the court and to the completion of discovery procedures. The plaintiff emphasized before the lower court that prospective residents were being driven away daily and urged an earlier hearing date. This case also differs from Huerbinger (supra) because the status quo is easily ascertained as the period before picketing began and there is no inconsistency here in the order of the court.

Appellants' suggestion that the status quo to be maintained is that of peaceful picketing is indefensible. Although picketing continued unrestrained throughout the summer while the construction was being completed, it was not until in the natural course of events plaintiff sought to fill its home that the injurious consequences of appellants' activities were felt. The reason we are compelled to view the matter in this light was well stated in O'Brien v. Matual, 14 Ill App2d 173, 186–187, 144 NE2d 446:

> "The primary purpose of a temporary injunction is to preserve matters in status quo until the court has had an opportunity to consider the cause upon its merits, or upon a motion to dismiss, i. e., to prevent such acts during the pendency of the action as would preclude the court from giving

198

the plaintiff or counter-claimant his remedy at the end of the litigation if he be entitled to such. Any other conclusion would place a premium upon seizing and establishing possession in fact by force rather than by seeking to alter the status in an orderly way by legal procedure. The status quo which should be preserved by a temporary injunction is the last, actual, peaceable, uncontested status which preceded the pending controversy, and the necessity of the temporary injunction should be made apparent by appropriate allegations showing that a change in the status would cause irreparable injury: Lincoln Trust & Savings Bank v. Nelson (1931) 261 Ill App 370; Gillam v. 661 Sheridan Apts., Inc., [1 Ill App2d 11]; Kabureck v. Stookey (1954) 1 Ill App2d 181; Nestor Johnson Mfg. Co. v. Goldblatt (1939) 371 Ill 570; Arends v. Naughton [11 Ill App2d 227]; Scholz v. Barbee (1951) 344 Ill App 630."

The last peaceable uncontested status in this case prior to the injunction was that status before picketing began. Northern Illinois Coal Corp. v. Langmeyer, 340 Ill App 423, 92 NE2d 802; Peoples Gas Light & Coke Co. v. Cook Lumber Terminal Co., 256 Ill App 357; and, Meredith v. Aurora, E. & C. R. Co., 142 Ill App 475, add nothing to an understanding of this case. The chancellor properly exercised the discretion vested in him.

Appellants can not seriously contend that a grant of a temporary injunction necessitating a postponement of a hearing on the merits of the case constitutes a denial of due process. This case will be returned to the lower court with directions for an immediate hearing on the merits regardless of the outcome here. If the plaintiff's nursing home should be filled by the time that the hearings might be concluded in appel-

199

lants' favor we presume that there is no doctrine of estoppel which would prevent compliance with the building code even at that late date. To interject a lengthy hearing on the merits before granting a temporary order, on the other hand, would severely harass and injure the plaintiff in its efforts to fill its nursing home. The complaint states that the plaintiff has expended or obligated itself approximately $750,000 prior to the opening of the nursing home.

Appellants' main point is that picketing is a form of speech and when done in a peaceful, truthful and informational manner must be accorded the same freedom as other areas of speech and may not be enjoined or otherwise restrained. We believe that in addition to appellants' understanding of the law there is an element of public policy which in every case must be weighed by the court considering the presented factual situation. As stated by Justice Frankfurter in Hughes v. Superior Court, 339 US 460, 464–466 and as applied by courts throughout the country:

"But while picketing is a mode of communication it is inseparably something more and different. Industrial picketing 'is more than free speech, since it involves patrol of a particular locality and since the very presence of a picket line may induce action of one kind or another, quite irrespective of the nature of the ideas which are being disseminated.' Mr. Justice Douglas, joined by Black and Murphy, JJ., concurring in Bakery & Pastry Drivers & Helpers Local v. Wohl, 315 US 769, 775, 776. Publication in a newspaper, or by distribution of circulars, may convey the same information or make the same charge as do those patrolling a picket line. But the very purpose of a picket line is to exert influences, and it produces consequences, different from other modes

of communication. The loyalties and responses evoked and exacted by picket lines are unlike those flowing from appeals by printed word. See Gregory, Labor and the Law 346–48 (rev ed 1949); Teller, Picketing and Free Speech, 56 Harv L Rev 180, 200–02 (1942); Dodd, Picketing and Free Speech: A Dissent, 56 Harv L Rev 513, 517 (1943); Hellerstein, Picketing Legislation and the Courts, 10 NCL Rev 158, 186–87, n 135 (1932).

"Third. A State may constitutionally permit picketing despite the ingredients in it that differentiate it from speech in its ordinary context. Senn v. Tile Layers Protective Union, 301 US 468. And we have found that because of its element of communication picketing under some circumstances finds sanction in the Fourteenth Amendment. Thornhill v. Alabama, 310 US 88; American Federation of Labor v. Swing, 312 US 321; Bakery & Pastry Drivers & Helpers Local v. Wohl, 315 US 769; Cafeteria Employees Union v. Angelos, 320 US 293. However general or loose the language of opinions, the specific situations have controlled decision. It has been amply recognized that picketing, not being the equivalent of speech as a matter of fact, is not its inevitable legal equivalent. Picketing is not beyond the control of a State if the manner in which picketing is conducted or the purpose which it seeks to effectuate gives ground for its disallowance. See Dorchy v. Kansas, 272 US 306; Milk Wagon Drivers Union v. Meadowmoor Dairies, Inc., 312 US 287; Hotel and Restaurant Employees' International Alliance v. Wisconsin E. R. B., 315 US 437; Carpenters & Joiners Union v. Ritter's Cafe, 315 US 722; Giboney v. Empire Storage & Ice Co., 336 US 490. 'A state is not required to tolerate in all places and all circumstances even peaceful

201

picketing by an individual." Bakery & Pastry Drivers & Helpers Local v. Wohl, supra at 775."

For cases enunciating a similar view, see International Brotherhood of Teamsters v. Hanke, 339 US 470; International Brotherhood of Teamsters v. Vogt, Inc., 354 US 284. Nor has the present court adopted a dissimilar position. The cases of Edwards v. South Carolina, 372 US 229 and Fields v. South Carolina (per curiam), 372 US 522, cited by appellants, both upholding the right to picket for the purpose of furthering a racial integration policy, merely reflect a judicial awareness of an overriding national policy in favor of integration. These cases cited none of the classic picketing cases, but emphasized instead that line of cases dealing with the dissemination of ideas which are provocative and challenging and tend to induce a condition of unrest. See, Feiner v. New York, 340 US 315; Chaplinsky v. New Hampshire, 315 US 568; Terminiello v. Chicago, 337 US 1; and Cantwell v. Connecticut, 310 US 296.

The courts of Illinois have held no differently. In the landmark case of Montgomery Ward & Co., Inc. v. United Retail, Wholesale & Dept. Store Employees, 400 Ill 38, 79 NE2d 46, a case in which picketing was not involved, Mr. Justice Gunn reviewed the case law pertaining to injunction against publications. The opinion nowhere states that picketing must be accorded every right of free speech and continually emphasizes that where coercion is present there is an exception to the general rule that publications may not be enjoined. Nor could this case be brought under the main point of the Montgomery Ward case—that equity does not have jurisdiction to enjoin the commission of crimes and libels. For the purpose of this appeal the plaintiff is waiving any reference to the truth or falsity of the statements on the placard and is willing to rest upon the proposition that in this

202

case the mere presence of pickets constitutes unlawful coercion as a matter of public policy.

██ Recent Illinois cases go further and explicitly cite with approval the rule of Hughes v. Superior Court (supra), and have stated the question to be one of public policy. See, Bitzer Motor Co. v. Teamsters, Local 604, 349 Ill App 283, 289, 110 NE2d 674. Jersey County Motor Co. v. Local Union No. 525, 21 Ill App2d 38, 45, 156 NE2d 633, cites International Brotherhood of Teamsters v. Vogt, Inc. (supra), for the proposition that a state has the right to curtail free speech when, in the exercise of its authority to declare and establish its public policy, either legislatively or judicially, it determines that such curtailment is necessary to protect the public interest and property rights.

That picketing for the purpose of harassment and to cause economic ruination even under the cloak of publicizing the truth of a purported building code violation is violative of the public policy of the State of Illinois is well settled. In Carpenters' Union v. Citizens' Committee to Enforce Landis Award, 333 Ill 225, 246, 164 NE 393, our Supreme Court stated:

> "No persons, individually or by combination, have the right to directly or indirectly interfere with or disturb another in his lawful business or occupation or for the sake of compelling him to do some act which in his own judgment his own interest does not require. Losses wilfully caused by another from motives of malice to one who seeks to exercise and enjoy the fruits and advantages of his own enterprise, industry, skill or credit will sustain an action."

And at 247:

> "Coercion is as easily accomplished without threats of violence as with them, and fear of loss of or injury to business unless one submits to

203

demands is as effective as fear of violence to his person. No person has a right to make war on another and to compel others to break off business relations with him to his injury. If an evil motive does not make a lawful act unlawful, it is equally true that what may be regarded as a good motive will not make an unlawful act lawful."

See also Bitzer Motor Co. v. Teamsters, Local 604, 349 Ill App 283, 290, 293, 294, 110 NE2d 674.

 A consideration of the above discussed authorities compels us to affirm the decree of the lower court. Presuming that the motive of the appellants here was no other than to publicly proclaim what they believed to be a building code violation, and thereby stop the plaintiff's business, they were nevertheless properly enjoined. The effect of the picketing was to severely and irreparably prevent the plaintiff from developing its property in the natural course of its business in violation of the public policy of this state. In bringing about this effect the picketing was economically coercive. It is particularly so because the plaintiff's building conformed to the revised plans approved by the building commissioner. The temporary injunction is further appropriate because the plaintiff would be very likely ruined without it while the appellants and the public suffer no injury economically or otherwise.

We direct that the case be returned to the lower court for immediate hearings on the merits.

The order for a temporary injunction is affirmed with directions.

Affirmed.

FRIEND J., concurs.

BURKE, P. J., dissenting.

BURKE, P. J., dissenting:

It is undisputed that the walls and partitions in a nursing home must have a fire resistance rating of one hour and that they must also be of noncombustible material. The building commissioner gave no consideration whatsoever to the requirement of combustibility or heat resistance and considered only the requirement of fire resistance. The requirements of the ordinance are conjunctive. The material must not only be fire resistant for one hour; it must also be noncombustible. In many types of constructions it may not be essential that both requirements be met, but in nursing homes the City Council has properly provided as a measure of protection for the aged and infirm, that both safety features be considered because of the large number of people occupying these units. To protect the numerous occupants it is not only important that the walls be merely resistant to fire, they must be resistant to heat. It is essential in a crowded building that the walls themselves not burst into flame should a fire get out of control. The requirement of noncombustibility was never considered by the building commissioner. Thus there was no administrative determination to collaterally attack. Moreover, the plaintiff has stipulated for the purposes of this appeal that the wall board which it used will ignite at temperatures below 1200° Fahrenheit, the ordinance minimum. The walls and partitions are combustible. Safety is impaired. The signs carried stated the truth.

As far as the building permit is concerned the defendants made no contentions in their signs with regard to whether or not there is or is not a valid permit. What the defendants have stated in the signs is that the building code is being violated. On that issue the cases make it clear that the existence or non-

205

existence of a permit is immaterial. As the building code was being violated the commissioner had no authority to permit construction of this type of building with gypsum board. A void administrative action binds no one. In Sinclair Refining Co. v. City of Chicago, 246 Ill App 152, wherein the plaintiff sued to enjoin the City from interfering with the erection of a filling station in Chicago, the plaintiff had previously sought and obtained both a permit from the City to install gasoline tanks and a permit from the Commissioner of Buildings to erect the building. Thereafter the City forbade plaintiff from building his station because of an ordinance prohibiting gas storage tanks within 200 feet of a public school, church or hospital. The court in rejecting the argument that there could be an estoppel based on the two prior permits, said (162): "To hold that merely the acts of an employee could be the basis for such an estoppel as is claimed in the instant case, would be going in the direction of suspending and repealing ordinances without any action on the part of the city council; in other words, making acts of the employees or agents, though beyond the scope of their authority, and known by the parties to be such, the equivalent of legislation." See also Meltzer v. City of Chicago, 152 Ill App 334.

The plaintiff did not construct the building in reliance upon a permit for gypsum wall board, but rather sought ex parte, ex post facto approval after it had violated the building permit calling for plaster. The following cases also hold that a permit in contravention of the city building code is a nullity: J. Burton Co. v. City of Chicago, 236 Ill 383, 86 NE 93; Hibbard, Spencer, Bartlett & Co. v. City of Chicago, 173 Ill 91, 50 NE 256, and People ex rel. Younger v. City of Chicago, 280 Ill 576, 117 NE 779. Although numerous of the criminal and stop order provisions of the ordinances refer to building without a permit, most of

206

them broadly provide penalties for all conduct which fails to conform with the provisions of the code. Plaintiff departed from the plans. No new permit was ever issued. No new permit could be issued as there had not been removal of material in violation of the code. Restrictions on collateral attack are part of the doctrine of res judicata which applies only to parties and their privies, but not to strangers. Plaintiff claims that the defendants are strangers to the dispute. Defendants cannot be affected by an adjudication of the commissioner in a matter to which they were not parties or privy. See Hedlund v. Miner, 395 Ill 217, 69 NE2d 862.

The plaintiff has admitted for the purposes of this appeal that the materials are combustible. The chancellor refused to permit the defendant to present its factual defenses. A charge of violation of the code is made on the placards. The reply filed by the plaintiff states that these signs are false and untrue. Plaintiff has put in issue the charges that the walls and partitions in the nursing home are combustible and that a building code violation exists. Plaintiff interrogated a witness to establish that the charges made on the signs were untrue. The defendants had a clear right to refute any charges by direct evidence and by cross-examination of witnesses. Any issue of fact could have been speedily and convincingly resolved by permitting the defendant to bring in his oven and prove before the chancellor that the materials were combustible in violation of the ordinance.

It is the law of this state that where it appears that a plaintiff cannot have the ultimate relief he seeks, the application for a preliminary injunction should be denied. Biehn v. Tess, 340 Ill App 140, 91 NE2d 160; Tidd v. General Printing Co., 257 Ill App 596. It is well settled that equity will not enjoin a libel nor impose an order of restraint on freedom of speech.

Montgomery Ward & Co. v. United Retail, Wholesale & Dept. Store Employees of America, C.I.O., 330 Ill App 49, 70 NE2d 75, affd 400 Ill 38, 79 NE2d 46. The Supreme Court there pointed out that there are exceptions to the rule relating to prior restraints on freedom of speech. None of these restraints is applicable to the case at bar. It is undisputed that the picketing has been peaceful. The Montgomery Ward case is the most recent expression of the law of Illinois respecting restraints of freedom of speech. The leading case in the U. S. Supreme Court concerning peaceful picketing is Thornhill v. Alabama, 310 US 88. In that case the court struck down an Alabama statute that made it unlawful for any person to picket the works or place of business of persons, firms, corporations or associations of persons for the purpose of hindering, delaying or interfering with or injuring any lawful business or enterprise of another. In Thornhill the court said that the freedom of speech and of the press guaranteed by the Constitution embraces "at least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment." In A.F. of L. v. Swing, 312 US 321, the court held that the constitutional guarantee of freedom of speech was infringed by an Illinois common law policy limiting peaceful picketing to cases of a labor controversy between an employer and its own employees.

In Hughes v. Superior Court of California, 339 US 460, a Negro group demanded that the store owner hire Negro help in proportion to the Negro trade and, when the demand was refused, the Negroes began picketing the store. The Federal Supreme Court said (p 467) that "California chose to strike at the discrimination inherent in the quota system by means of the equitable remedy of injunction to protect against unwilling submission to such a system," and that "it is not for this Court to deny to California that choice

from among all 'the various weapons in the armory of the law.' " The Federal Court in affirming the decree in the Hughes case decided not to interfere with the carrying out of the public policy of California. The opinion concluded (p 469) that "The injunction here was drawn to meet what California deemed the evil of picketing to bring about proportional hiring. We do not go beyond the circumstances of the case. Generalizations are treacherous in the application of large constitutional concepts." The Hughes case cannot give any comfort to the plaintiff. All that case did was to affirm the public policy of California against segregation. In the case at bar the injunction violates the public policy of Illinois expressed in well considered opinions, that peaceful picketing when asserting the truth is valid. The court cannot enjoin the telling of the truth.

Defendants have a legitimate grievance with the building commissioner for failing to enforce the building code in this instance. They have a separate grievance against the plaintiff who put up the building in violation of the code. They have a right to publicize these grievances in a peaceful and truthful manner. The City Council's determination that only noncombustible materials may enter into construction of nursing homes merits the concern of all citizens. Any citizen has the right to peacefully manifest that concern. The cases cited by plaintiff relate to picketing for an unlawful purpose. Plaintiff has failed to show an unlawful purpose in the picketing of its building. Plaintiff makes the contention that in some way liberty of speech and the right of assembly and to petition for a redress of grievances, are geographically limited to the Court House Square because, he says defendant's sole dispute is with the building commissioner. Were such a proposition correct, there would be very little left of the constitutional freedom of speech and of the right to petition for a redress of grievances.

209

The injunction not only requires the removal of the person or persons with placards, denominated "pickets," but it bars defendants from communicating in any way with any person who might become an occupant of the home and telling him of the dispute raised by plaintiff's law suit. Defendant union and the individuals enjoined are actively engaged in the construction industry and in the building trades. Defendants are at the scene of building. Their opportunity to observe violations as shown here are unequalled. Their right to organize to protect effectively the endangering of life and health and the lowering of standards is the right enjoyed by all business, trade and professional groups within our society. Plaintiffs have failed to make out a case for relief. The injunction shields a law violator from just criticism. Illinois law does not permit a court of chancery to do this. The case is not returned to the trial court. The case has been in the trial court and the hearing may proceed when issue is joined. This is an appeal from an interlocutory order. The order granting the injunction should be reversed.